Estate of Herbert G. Riecker, By Central Hanover Bank & Trust Co., as Executor v. Commissioner.
Estate of Riecker v. Commissioner
Docket No. 2871.
United States Tax Court
1944 Tax Ct. Memo LEXIS 12; 3 T.C.M. (CCH) 1293; T.C.M. (RIA) 44397; December 11, 1944
*12 Grant Hoerner, Esq., 220 W. 42nd St., New York, N. Y., for the petitioner. William F. Evans, Esq., for the respondent. STERNHAGEN The Commissioner determined a deficiency of $2,327.99 in estate tax. The petitioner assails the determination of the value of 474 shares of Lenz & Riecker, Inc., at $66,360. Findings of Fact The petitioner is the executor of the estate of Herbert G. Riecker, who died on January 23, 1941. The estate tax return was filed June 18, 1941, in the First District of New York. Prior to December 30, 1937, Herbert G. Riecker and his older brother, William F. Riecker, had for 24 years been associated in the business of printing and binding, owned by a corporation, Lenz & Riecker, Inc. William was president and Herbert secretary and treasurer of the corporation. Its 2,200 outstanding shares were on December 30, 1937, and at the time of the death of Herbert held as follows: William F. Riecker
828 shares
Jessica A. Riecker, his wife
480 shares
Herbert G. Riecker
474 shares
Five others
418 shares
2,200 shares
In February, 1937, after William's return to the business from an illness, the brothers discussed what would happen to the business if William *13 were to die. William was then age 51 and Herbert 43. An agreement was made on December 30, 1937, between William F., first party, Jessica A., his wife, second party, Herbert G., third party, Theresa E., his wife, fourth party, and Lenz & Riecker, Inc., trustee, fifth party. The preamble recited that William, Jessica and Herbert owned, respectively, 828, 480 and 474 shares of the corporation; that Jessica owned insurance policies on the life of William as follows: No. 736,301
Travellers
7/11/21
Ordinary Life
$10,000
No. 809,789
Union Central
7/25/24
Endowment at 85
10,000
No. 4,325,238
Metropolitan
8/17/25
Ordinary Life
15,000
No. 3,511,371
Mutual Life
8/13/25
Ordinary Life
15,000
No. 7,297,837
Prudential
4/17/31
Modified Life "3"
10,000
No. 7,297,838
Prudential
4/17/31
Modified Life "3"
10,000
$70,000 that Theresa owned insurance policies on the life of Herbert as follows: No. 809,806
Union Central
7/25/24
Endowment at 85
$10,000
No. 15,122,933
New York Life
10/18/30
Ordinary Life
10,000
No. 7,333,239
Prudential
5/16/31
Modified Life "3"
5,000
$25,000 and that the purposes of the agreement were "to enable *14 the party of the third part to obtain stock control of the Corporation in the event he survives the party of the first part and also to provide a way of liquidating the stock interests in the Corporation of the party of the first or third parts who shall predecease the other; * * *." The agreement provided that upon the death of either William or Herbert, the survivor "shall purchase" the shares of the corporation then held by the one dying, as well as any other shares which might become subject to the terms of the agreement, and the legal representatives of the deceased "shall sell" such shares on the terms and conditions of the contract. If Herbert should survive, the 480 shares belonging to Jessica were to be considered as shares of William for the purposes of the agreement, for which, however, she was to be paid as provided. The purchase price of the shares was fixed at $125 a share until March 15, 1938; thereafter, in each calendar year between January 1 and March 15, William and Herbert were to make and sign a certificate of valuation establishing the purchase price for the following year. During the continuation of the agreement, William was required to pay the net premiums *15 on the policies on Herbert's life and have a credit of the proceeds of such policies on the purchase price of Herbert's shares. Herbert was required to pay the net premiums on the policies on William's life and have a credit of the proceeds of such policies on the purchase price of William's shares, and part of the proceeds of such policies equal to the value of Jessica's shares was to be the consideration for the assignment by her of her shares to the legal representatives of William. To provide for the payment of all or part of the balance of the purchase price, William and Herbert were each to establish a sinking fund. In his fund Herbert was to deposit one-half of all dividends paid on his shares and William in his fund was to deposit an amount equal to one-half of the amount deposited by Herbert. As a part of his sinking fund each was permitted to purchase one or more insurance policies on the life of the other and pay all or a part of the first annual premium out of his accumulated sinking fund. The sinking funds and additional insurance policies were to be made payable to the corporation, trustee. The trustee was to pay the net premiums on the insurance policies, to make the *16 required deposits to the sinking funds, including payment of net premiums on policies which might become a part of either of the sinking funds, and to charge such payments and deposits against the salaries of William and Herbert. Upon the death of either, the trustee was to collect the proceeds of any policies made payable to it as trustee and deliver so much of the proceeds thereof to the deceased's legal representatives as was necessary to complete the payment of the purchase price of his shares and the balance to the survivor. If the sinking fund of the survivor should be insufficient to pay the balance of the purchase price, the trustee was to deliver the proceeds of such sinking fund to the deceased's legal representatives. The trustee was to deliver to the deceased's legal representatives the sinking fund established by deceased and the policies above listed to the respective owners thereof. The survivor was given the right within 60 days after the death of the other to purchase any policies on his life which were made a part of the sinking fund of the deceased at a price equal to the cash surrender value at the time of purchase plus the proportionate part of the prepaid premium, *17 if any, at such time. In the event the sinking fund of the survivor should not be sufficient to pay the balance of the purchase price of the shares of the deceased the survivor could pay the balance in quarterly installments of at least $1,250, with interest at 5 per cent per annum, provided, however, that if more than $5,000 was paid on principal in any one financial year, then during the succeeding financial year the rate of interest was to be reduced one-half of one per cent for each $1,000 of excess principal paid during the preceding financial year, but in no event was the rate of interest to be less than 3 per cent. William, Jessica, and Herbert reserved the right "to withdraw shares from the provisions of" the agreement "in order to give them to a child of such party" but William and Jessica were not permitted to withdraw enough shares to make the stock ownership of Herbert, in the event of William's death, less than 51 per cent of the outstanding shares of the corporation. The certificates for the shares and for any additional shares acquired by William, Jessica or Herbert, were to be endorsed as subject to the provisions of the agreement. The agreement was made binding upon *18 the successors and assigns. It could be altered or revoked by the joint action of William and Herbert and their wives, the consent of the trustee being necessary only in the event any change would increase its duties or obligations as trustee. Prior to December 30, 1937, the corporation was the beneficiary named in each of the insurance policies upon the life of William and Herbert. At a special meeting of the stockholders held on October 7, 1937, resolutions were adopted directing the corporation to transfer the policies on William's life, in the amount of $70,000, to Jessica, and the policies on Herbert's life, in the amount of $25,000, to Theresa. December 30, 1937, the policies on William's life were assigned to Jessica and the policies on Herbert's life were assigned to Theresa. Thereafter, until Herbert's death, the premiums on all such policies were paid by the corporation. The premiums of $1,921.15 paid on the policies on Herbert's life were charged to the account of William on the corporate books and the premiums of $5,495.75 paid on the policies on William's life were charged to the account of Herbert. At the time the agreement was made, Herbert had three children between *19 the ages of 13 and 6. After the agreement of December 30, 1937, Herbert, from May 31, 1938, to June 6, 1939, deposited with the corporation a total of $7,000 out of dividends received by him from the corporation and this was credited to a "Trustee Account for H. G. Riecker" on the corporation's books. This account represented the sinking fund set up for Herbert. In a similar account set up for William, amounts were credited from May 31, 1938, to April 22, 1939, totalling $2,500. In May, 1938, Herbert purchased a $50,000 Modified Life "3" insurance policy on the life of William. Three annual premiums of $2,085 each were paid in 1938, 1939 and 1940, and charged to the Trustee Account for H. G. Riecker, leaving a credit balance of $745 as of June 4, 1940, which was paid by the corporation to the estate of Herbert. On March 15, 1940, William and Herbert executed a certificate of valuation fixing the value of the shares for the 12 months ending March 15, 1941, at $140 per share. After Herbert's death, his widow, Theresa, filed proof of death with each of the three insurance companies under the policies referred to in the agreement of December 30, 1937, and the proceeds thereof were *20 paid to her. On May 28, 1941, the executor of Herbert's estate and William made an agreement in part as follows: "WHEREAS, the purchaser and the said HERBERT G. RIECKER, deceased, heretofore entered into a certain agreement dated December 30, 1937, under the terms of which the purchaser upon the death of the said HERBERT G. RIECKER on January 23, 1941, became obligated to buy and the seller became obligated to sell four hundred seventy-four (474) shares of stock of LENZ & RIECKER, INC., belonging to the said HERBERT G. RIECKER, at one hundred forty dollars ($140.00) per share, on the terms and conditions set forth in said contract; and "WHEREAS, the purchaser by the terms of said contract is entitled to a credit of twenty-five thousand dollars ($25,000.00) on account of the purchase price of the said stock, by reason of paying the premiums on certain policies on the life of the said HERBERT G. RIECKER, owned by his wife, THERESA E. RIECKER, and made payable to her; and "WHEREAS, the seller has received two thousand five hundred dollars ($2,500.00) on account of the purchase price of said shares of stock from a fund established by the purchaser pursuant to the terms of the said *21 contract; and "WHEREAS, THERESA E. RIECKER, HENRY F. EBERHARD, MILDRED H. CARADINE and THOMAS A. LEONETTI desire to purchase from the seller certain of said shares of HERBERT G. RIECKER in the respective amounts hereinafter set forth; "NOW THEREFORE, in consideration of the premises and the terms and conditions hereinafter set forth, the parties hereto have agreed as follows: "FIRST: The purchaser hereby releases to the seller his right to purchase two hundred seventy-four (274) of said four hundred seventy-four (474) shares of LENZ & RIECKER, INC., stock, and consents that the seller shall sell said two hundred seventy-four (274) shares of stock as follows: Number of
Purchase
Cash
Buyer
Shares
Price
Payment
THERESA E. RIECKER
100
$14,000.00
$14,000.00
HENRY F. EBERHARD
52
7,280.00
7,280.00
MILDRED H. CARADINE
56
7,840.00
1,011.20
THOMAS A. LEONETTI
66
9,240.00
1,504.00
274
$38,360.00
$23,795.20 In addition to the purchase price for their stock, the respective buyers shall also pay interest at the rate of five per cent (5%) per annum on the purchase price of their respective shares from January 23, 1941, to the date of purchase. Where the cash *22 payment is less than the purchase price, the balance of the purchase price shall be paid in thirty-two (32) equal quarter-annual installments, together with interest at the rate of five per cent (5%) per annum on the unpaid portion of the purchase price. The seller shall hold the said shares sold on the installment plan as collateral security for the payment of the unpaid portion of the purchase price. "SECOND: The purchaser, upon the signing of this agreement, shall pay to the seller five hundred dollars ($500.00) together with interest thereon at the rate of five per cent (5%) per annum from January 23, 1941, and the seller shall deliver to the purchaser a certificate for two hundred (200) shares of stock of LENZ & RIECKER, INC." * * *
Of the 474 shares held by Herbert at the time of his death 274 shares were sold at $140 a share by the executor of his estate to the four persons named in the above agreement. To purchase their shares Leonetti and Caradine made separate agreements with the executor for payment on the installment plan at $140 a share, payment of which was guaranteed by William. Two hundred of the shares were surrendered by the executor to William upon the receipt *23 of $500 in cash from William and the deposit of $2,500 in the sinking fund by William. The executor received no part of the $25,000 insurance proceeds. William, for $2,397.03, purchased from the executor the $50,000 Modified Life "3" insurance policy on Herbert's life. In the estate tax return the 474 shares were included in the gross estate at a value at date of death of $41,360, arrived at as follows: 474 shares Lenz & Riecker, Inc.,
par $50 at 140
$66,360.00
Less proceeds of insurance ap-
plied on account
25,000.00
$41,360.00
The value of the 474 shares of Lenz & Riecker, Inc., on January 23, 1941, was $66,360. Memorandum Opinion STERNHAGEN, Judge: When the decedent died in 1941, he owned and left in his estate 474 shares of Lenz & Riecker, Inc., the value of which (the figure of value is not in controversy) was $140 per share, or $66,360. His executor, however, in the estate tax return did not include this full amount in the decedent's gross estate, but reduced it by the $25,000 insurance on the decedent's life, payable to his wife, the premiums on which had been paid by William by virtue of the contract of December 30, 1937. This, it says, is because the contract *24 operated to reduce the amount which William was required to pay for the shares after Herbert's death, and hence served to reduce the value of the shares in the gross estate. No attention is paid to the fact that of the entire 474 shares owned by the decedent at the time of his death, 274 were in fact sold by the executor to four persons other than William at a price of $140 a share, indicating that the figure of $140 per share was not only a figure of value agreed upon by the brothers but also the value at which some of the shares were sold and bought in arm's length transactions. There can be no doubt that the value of the shares in the decedent's estate was $140 per share, or $66,360. This disposes of the case, for it determines the only question that the petitioner raises. There is no significance for present purposes in the question whether the 1937 contract of the brothers was enforceable in equity and binding on the executor, and it may be assumed, without deciding, that it was; and it may also be assumed arguendo that the "credit" of the $25,000 insurance was a clear burden on the estate which operated to reduce the price which William was required to pay for the 200 *25 shares. However, these propositions do not serve to lower the value of the 474 shares which were in the gross estate below the $66,360 which the Commissioner has determined and which is the only determination which the petitioner assails. Since the shares are included in the gross estate at their full value of $140 each, under Section 811 (a), there is no occasion to consider the alternative authority of Section 811 (d), cited also by the Commissioner in the deficiency notice. There may be a collateral question under Section 811 (g) in respect of the place of the $25,000 insurance in the estate, but no such question is raised. Apparently the petitioner did not include this in the estate shown on the return and the Commissioner did not add it as an item of the deficiency. It is not easy therefore to see any justification for saying that, not only is the insurance to be omitted from the gross estate, but that it serves also to reduce the value of the shares which is otherwise included. Decision will be entered for the respondent.